**2006 BNH 033    Note:   This is an unreported opinion.  Refer to AO 1050-1 regarding citation.**
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                    Bk. No. 04-14151-JMD and
                                                          Bk. No. 04-14152-JMD

Robotic Vision Systems, Inc., and                         Jointly Administered
Auto Image ID, Inc.,                                      Chapter 7
                    Debtors


*Charles A. Dale, III, Esq.*                              *Thomas Pappas, Esq.*
*McCarter & English, LLP*                                 *Wiggin & Nourie, P.A.*
*Boston, Massachusetts*                                   *Manchester, New Hampshire*
*Attorney for Pat V. Costa, Creditor*                     *Attorney for Pat V. Costa, Creditor*

*James W. Donchess, Esq.*                                 *Steven M. Notinger, Esq.*
*Donchess & Notinger, PC*                                 *Chapter 7 Trustee*
*Nashua, New Hampshire*                                   *Nashua, New Hampshire*
*Attorney for Chapter 7 Trustee*


## <u>MEMORANDUM OPINION</u>

## I.  INTRODUCTION

The Court has before it the Recusal Motion of Pat V. Costa (Doc. No. 1735) (the

"Motion").  In the Motion, Pat V. Costa ("Costa"), a creditor maintaining secured, priority

administrative and general unsecured claims in this proceeding[1] has requested the Court to

_____

[1]  As of the date of this Memorandum Opinion, Costa has filed proofs of claim for (a) a secured claim of $500,000.00 (POC 183); (b) a general unsecured claim under a prepetition indemnification agreement with the Debtors (POC 184); (c) a $4,925.00 priority unsecured claim for unpaid wages and employee benefits arising from his employment with the Debtors (POC 185); and (d) a $237,000.00 administrative priority expense claim for unpaid postpetition wages and amounts due and owing under the Debtors' indemnification obligations to him (POC 732).  None of Costa's proofs of claim have been the subject of an objection.  However, the Trustee has indicated that he will be objecting to some or all of such claims and may be seeking to equitably subordinate Costa's allowed claims.  For the purposes of the Motion, the Court shall assume that all of Costa's claims are ultimately allowed.

recuse itself from "adjudicating further matters in this case that involve estate professionals, including the final fee applications (and related settlements proposed by the Chapter 7 Trustee) of Marotta, Gund, Budd and Dzera, LLC ("MGBD") (Dkt. No. 1503), Dreier LLP ("Dreier") (Dkt. No. 1502), and the objections thereto (Dkt. Nos. 1608, 1610)."[2] Doc. No. 1735 at 2 (original footnote omitted).  Steven Notinger, chapter 7 trustee (the "Trustee"); Murtha Cullina, LLP, former counsel to the Official Committee of Unsecured Creditors (the "Committee") prior to the conversion of these proceedings to chapter 7; and Dreier and Sheehan Phinney Bass + Green, P.A., both former counsel to the Debtors prior to the conversion of these proceedings to chapter 7, all filed objections to the Motion (Doc. Nos. 1748, 1749, and 1750).

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.  BACKGROUND

Robotic Vision Systems, Inc. and Auto Image ID, Inc. (the "Debtors") each filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code[3] on November 19, 2004.  The Debtors' cases have been jointly administered, but not substantively consolidated.

---

[2]  In an order dated May 26, 2006 (Doc. No. 1701), the Court converted the contested final fee application of MGBD to an adversary proceeding (Adv. No. 06-1158-JMD) and the contested final fee application of Dreier to an adversary proceeding (Adv. No. 06-1157-JMD).

[3]  In this opinion the terms "Bankruptcy Code," "Code," and "§" shall mean title 11 of United States Code, 11 U.S.C. §§ 101 et seq., prior to enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, on April 20, 2005.

The Debtors filed their petitions due in substantial part to a breakdown in their relationship with their primary prepetition lender, RVSI Investors, L.L.C. (the "Lender").

On November 21, 2004, at 9:46 p.m. the Debtors filed their Ex Parte Emergency Motion for Order Authorizing Use of Cash Collateral (Doc. No. 15) (the "First Cash Collateral Motion").  Ordinarily, the initial ex parte request to use cash collateral in a chapter 11 proceeding is considered by the Court without a hearing and authorizes a debtor, subject to providing adequate protection to the lenders holding security interests in cash collateral, to expend the minimum funds necessary to avoid immediate and irreparable harm to the estate pending notice and a hearing.  See Fed. R. Bankr. P. 4001(b)(2).  However, in these cases, the Lender filed its objection to the use of cash collateral (Doc. No. 16) (the "Lender's First Objection") only fifteen hours later on November 22, 2004, at 12:54 p.m.  The Lender's First Objection reflected the prepetition breakdown between the Lender and the Debtors' management.  In the Lender's First Objection, the Lender alleged that Costa was "suspicious that a wide array of commercial parties" harbored ill will towards the Debtors, including "Intel, competitors GSI Lumonics, KLA-Tencor, Cognex, terminated investment banker U-Group, Needham & Company, Deloitte, law firms Skadden, Arps, Hanify & King and Gibson Dunn & Crutcher" as well as the Lender and certain of its officers and employees.  The Lender alleged that rather than focusing his energies on an agreed upon process to sell one of the Debtors' business units, "Costa has obsessed over alleged misconduct by Intel Corp. and, over the past months, Costa has trained his obsession on an array of outlandish conspiracy theories directed at Lender and its affiliates in order to rationalize, in his mind perhaps, the degrading financial performance of the Debtor under his stewardship."

The hearing on the First Cash Collateral Motion commenced on the afternoon of November 23, 2004.  The Debtors denied the allegations of the Lender regarding Costa's management of the Debtors' affairs and alleged that the Lender was trying to take over the Debtors' business.  The Court did not take any evidence on any of the allegations of mismanagement and adjourned the hearing later in the afternoon.  See Order dated November 23, 2004 (Doc. No. 38).  After negotiations that proceeded through most, if not all, of the night, the hearing reconvened on November 24, 2004, and the parties eventually reported to the Court that they had reached a consensual agreement on the use of cash collateral.  After adjournment of the cash collateral hearing on November 24, 2004, the parties completed work on a proposed order which was entered by the Court (Doc. No. 46) (the "First Cash Collateral Order") authorizing the use of cash collateral through December 24, 2004.

The Debtors' contentious prepetition relationship with the Lender continued postpetition as the Debtors' postpetition operations were also plagued by the need to operate in the red on a cash flow basis.  See the Budget attached to the First Cash Collateral Motion and the First Cash Collateral Order.  The Debtors' need to use more cash than generated from operations required either new postpetition financing or an accommodation with the Lender.  Accordingly, the Lender had even more bargaining power in these cases than the typical first priority lender in the early stages of a bankruptcy case.  The Debtors attempted to reduce the Lender's bargaining power by seeking alternative postpetition financing or by convincing the Court to find that the going concern value of their two operating divisions was sufficient to provide adequate protection for the Lender.  Both of these attempts were ultimately unsuccessful.  On December 13, 2004, the Debtors filed an Ex Parte Motion for Order Amending and Extending the Order

Authorizing the Use of Cash Collateral (Doc. No. 118) (the "First Cash Collateral Extension").

The First Cash Collateral Extension recited that the Debtors and the Lender had agreed to an

extension of authority to use cash collateral through January 13, 2005, with an extension through

January 31, 2005, if certain conditions regarding a sale of one of the Debtors' operating divisions

were satisfied.  The Court granted that motion (Doc. No. 127) (the "First Cash Collateral

Extension Order").

Despite the superficial consensual resolution of the Debtors' right to use the Lender's

cash collateral, day-to-day relations between the parties were contentious.  The Debtor accused

the Lender of failing to follow their agreement on the availability of cash collateral and the

Lender accused the Debtors of not supplying timely or accurate data to support their

computations of availability under their agreement.  Notwithstanding the agreement to extend

cash collateral usage from December 14, 2004, to January 13, 2005, the Lender filed a motion on

December 31, 2004, seeking the appointment of a chapter 11 trustee and an order requiring the

immediate sale of one of the Debtors' operating divisions (Doc. No. 167).

The Debtors' bankruptcy petitions were filed as so-called skeletal petitions, that is the

bankruptcy schedules and statement of financial affairs (collectively the "Schedules") were not

included.  In an order dated November 22, 2004 (Doc. No. 21), the Court granted the Debtors'

pro forma request for an extension of time to file the Schedules (Doc. No. 6) to December 20,

2004.  On December 13, 2004, the Debtors requested a second extension of time to file the

Schedules until February 14, 2005, or nearly ninety days after the filing of their petitions (Doc.

No. 119).  The Debtors' requested extension was extraordinary and was objected to by the

Committee, the United States Trustee ("UST"), and one of the Debtors' shareholders.  The

objecting parties argued that the extension should not be granted because (a) the Debtors, as public companies, were required to maintain and file periodic reports with the Securities and Exchange Commission; (b) the Schedules were necessary to provide parties in interest and the Court with information necessary for matters scheduled for hearing on January 13, 2005 (i.e., stay relief, a motion to pay prepetition payroll, a possible contested cash collateral motion, and a possible contested motion to appoint a chapter 11 trustee); (c) the requested extension date was beyond the sixty-day deadline under § 365(d)(4) for the Debtors to accept or reject non-residential real estate leases; and (d) the requested extension date was only one month before the end of the Debtors' exclusive period to file a plan under § 1121(b).  The Debtors contended that they were unable to file the Schedules sooner due to many urgent legal and business issues requiring the attention of management.  Five of the seven specific issues identified by the Debtors as preventing them from filing the Schedules related to (a) their disputes with the Lender over continued use of cash collateral; (b) the motion to appoint a chapter 11 trustee; (c) discovery demands; (d) sale of an operating division; and (e) negotiations with prospective replacement lenders.  See In re Robotic Vision Sys., Inc., 2004 BNH 029, at 5.

On December 21, 2004, the Debtors filed their Second Motion for Order Authorizing Continued Use of Cash Collateral (Doc. No. 166) (the "Second Cash Collateral Motion").  In that motion the Debtors alleged that despite good faith efforts to work with the Lender on the use of cash collateral, the Debtors' ability to conduct their business affairs and reorganize were being impaired by the Lender's arbitrary and ever changing requirements to determine availability of cash collateral, numerous unnecessary audits and visits by professionals hired by the Lender to review the Debtors' records, interference with the sale of an operating division through

6

numerous information requests directed to the Debtors and their advisors, and acting in a manner to impermissibly obtain control over the Debtors' business decisions and operations. Before the hearing on the Second Cash Collateral Motion, the Debtors filed a motion seeking to amend the First Cash Collateral Order (Doc. No. 263) (the "Motion to Amend First Cash Collateral Order"). The Court scheduled a hearing on the Motion to Amend First Cash Collateral Order on an expedited basis before the hearing on the Second Cash Collateral Motion. After a contested evidentiary hearing, the Court denied the Motion to Amend First Cash Collateral Order. See Order dated January 19, 2005 (Doc. No. 357). Shortly after the entry of that order, the Debtors filed a written notice of consent to the terms of a proposal by the Lender to provide for the further use of cash collateral and the continuation of the Debtors' operations (Doc. No. 365) (the "Debtors' Consent"). After a hearing on the Second Cash Collateral Motion on January 20, 2005, the Debtors stated on the record in open court their agreement to the terms proposed by the Lender with minor amendments. That agreement was incorporated into the terms of a proposed order submitted to and entered by the Court on January 20, 2005 (Doc. No. 374) (the "Second Cash Collateral Order").

Under the terms of the Second Cash Collateral Order, the Debtors' crisis manager, J. Richard Budd of MGBD ("Budd" or "Controlling Person"), was appointed as "Controlling Person" pursuant to §§ 105(a) and 1107(a) of the Bankruptcy Code. The Second Cash Collateral Order granted to the Controlling Person all rights and powers, and the obligation to perform all the functions and duties, of the Debtors, as debtors in possession, until all of the obligations to the Lender were indefeasibly paid in full in cash. After the entry of the Second Cash Collateral Order, which was entered with the Debtors's consent, Costa and the Debtors' board of directors

(the "Board of Directors") had no authority over the management or operations of the Debtors unless and until the Lender was paid in full.

Shortly after the entry of the Second Cash Collateral Order, a series of disputes arose between the Debtors and Costa over a number of issues as reflected in various filings with the Court between January 26, 2005, and March 1, 2005:  Debtors' Emergency Expedited Motion to Compel Pat V. Costa to Perform His Obligations in Connection with Intel Loan Agreement filed January 26, 2005 (Doc. No. 425); Motion of Pat V. Costa to Amend Second Cash Collateral Order Dated January 20, 2005, filed January 31, 2005 (Doc. No. 453); Verified Motion of Pat V. Costa for Expedited Hearings and For a Temporary Restraining Order filed February 1, 2005 (Doc. No. 463); Debtors' Motion to Reject Certain Employment Agreements (including an agreement with Costa) filed February 7, 2005 (Doc. No. 504); Motion of Pat V. Costa, Chairman of the Debtors' Board of Directors, For Relief From the Automatic Stay filed February 16, 2005 (Doc. No. 582); and Response of Pat V. Costa to Debtors' Motion for Authority to Sell Substantially All Assets of Semiconductor Equipment Group Division filed March 1, 2005 (Doc. No. 728).  In summary, subsequent to the Debtors' agreement with the Lender for Costa and the Board of Directors to step aside and permit the Controlling Person to operate and manage the affairs of the Debtors until payment in full of the Lender's claims, Costa continued to be engaged in these bankruptcy cases and to oppose most of the actions of the Controlling Person requiring approval from the Court.

Costa's most recent opposition in these bankruptcy cases has been his objections to the final fee applications of Dreier and MGBD, which are based upon not only the value of the services rendered to the Debtors, but also on claims of fraud and legal malpractice.  <u>See</u> Costa's

Objections to the Fee Applications of Dreier (Doc. No. 1610) and MGBD (Doc. No. 1608).

Because Costa's objections raised issues of fraud and malpractice, the Court converted the final

fee applications into adversary proceedings.  See In re Robotic Vision Sys., Inc., 343 B.R. 393

(Bankr. D.N.H. 2006) (Doc. No. 1700) and Order dated May 26, 2006 (Doc. No. 1701).  The

Motion seeks the recusal of the Court in all pending and further matters involving estate

professionals, including the final fee applications of Dreier and MGBD and the related adversary

proceedings.


## III.  DISCUSSION

In his Motion, Costa requests the Court to recuse itself from adjudicating further matters

in these cases that involve estate professionals, including the final fee applications of Dreier and

MGBD, pursuant to 28 U.S.C. § 455(a) which provides:

> Any justice, judge, or magistrate of the United States shall disqualify himself in
> any proceeding in which his impartiality might reasonably be questioned.

Costa contends that recusal is appropriate because the Court's ability to critically assess whether

Dreier and MGBD engaged in misconduct or deception may reasonably be questioned as the

Court has previously accepted representations from these professionals, despite Costa's

allegations of misconduct and deception, when the Court ruled on and approved various motions,

including the Debtors' requests to sell substantially all of their assets.  According to Costa, if the

Court were to find now that the Debtors' professionals in fact engaged in misconduct and

deception, such a ruling by the Court would call into question every other order entered by the

Court in these cases, which, Costa apparently believes, is something the Court is unlikely to do.

Based upon his allegations, Costa concludes "it is virtually impossible for the Court to

objectively determine serious allegations of misconduct as they relate to" certain professionals. In addition, Costa alleges that the Court:  (a) has adopted the negative characterization of Costa advanced by certain professionals; (b) has adopted a deferential role with respect to estate professionals as evidenced by a recent decision of the Court on a final fee application based upon factual and legal arguments not made by the affected professional; and (c) has recently granted a third extension of time for the Trustee to object to Costa's proofs of claim "even though the Court found the Trustee's request to be unreasonable."

### A.  Applicable Legal Standard

The purpose of 28 U.S.C. § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible.  Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 865-65 (1988).  However, an appearance of impropriety may not be established by subjective judgment, suspicions or doubts.  Id.  A motion to recuse must have a factual foundation.  In re United States, 441 F.3d 44, 65 (1st Cir. 2006).  Under 28 U.S.C. § 455(a) the grounds for recusal must be evaluated on an objective basis, keeping in mind what matters is not the reality of bias or prejudice but its appearance to an objective observer.  Liteky v. U.S., 510 U.S. 540, 548 (1994); Liljeberg, 486 U.S. at 865; U.S. v. Snyder, 235 F.3d 42, 45 (1st Cir. 2000).

Judges should not recuse themselves lightly however.  Id.  A trial judge must hear a case unless there is some reasonable factual basis to doubt the impartiality or fairness of the tribunal. Snyder, 235 F.3d at 46.  "[T]he disqualification decision must reflect not only the need to secure public confidence through proceedings that appear impartial, but also the need to prevent parties from too easily obtaining disqualification of a judge, thereby manipulating the system for

strategic reasons, perhaps to obtain a judge more to their liking." In re Allied-Signal, Inc., 891

F.2d 967, 970 (1st Cir. 1989) (emphasis in the original).  However, the duty to sit does not exert

equal weight with avoiding the appearance of impropriety.  In a close case, "doubts ordinarily

ought to be resolved in favor of recusal." Snyder, 235 F.3d at 46 (quoting In re United States,

158 F.3d 26, 30 (1st Cir. 1998)).  If the factual basis established by the moving party provides

what an objective, knowledgeable member of the public would find to be a reasonable basis for

doubting a judge's impartiality, then recusal under 28 U.S.C. § 455(a) is required.  Allied-Signal,

891 F.2d at 970.

### B.  Impartial Determination of Allegations of Professional Misconduct

Costa argues that the Court has accepted representations of estate professionals in

connection with large and small matters despite allegations by Costa that the same professionals

have misrepresented material items to the Court or even committed fraud upon the Court.  Costa

contends that "[d]espite the overwhelming evidence in support of Costa's allegations, it would

be difficult for the Court to conclude that estate professionals are guilty of misconduct because it

has been repeatedly been put in a position where, even in the face of opposition from Costa, who

constantly complained of fraud and other misconduct, the Court relied upon the representations

of [estate professionals] in rendering its decision."  Motion at ¶ 5.  However, Costa has had, and

continues to have, an opportunity to present his claims of fraud and misconduct.  Contrary to the

allegations in his various motions, the Court has listened to Costa's claims and, consistent with

the due process rights of all parties, including Costa, granted Costa the opportunity to do

discovery and have a hearing on the merits of his claims.  The failure of Costa to have had a

hearing on the merits of such claims rests with his insistence on extensive discovery beyond the

scope of the claims articulated in his pleadings or pleading inconsistent positions in his pleadings.

Because the record in these cases is voluminous, any review of that record in connection with the allegations in the Motion will of necessity be lengthy.  The Motion raises serious questions, however, which require serious consideration.

### 1.  Motion to Amend Second Cash Collateral Order

Costa is correct that he has been constantly complaining about certain estate professionals.  However, all of those complaints arose after the entry of the Second Cash Collateral Order which removed Costa from the management and control of the Debtors. Initially those complaints were based upon the Controlling Person not fulfilling a "deal" Costa alleged Budd made with him and the Board of Directors to allow Costa and the Board of Directors limited input into the operations of the Debtors, notwithstanding the Debtors' Consent filed with this Court and the terms of the Second Cash Collateral Order, which granted plenary power to the Controlling Person.  Paragraph 1 of the Second Cash Collateral Order provides:

> Pursuant to Sections 105(a) and 1107(a) of the Bankruptcy Code and Fed.R.Bankr.P. 9001(5), the <u>Debtor hereby irrevocably appoints</u>, and the Court hereby approves the appointment of, <u>Mr. J. Richard Budd as the person in control of the Debtor (the "**Controlling Person**"). The Controlling Person shall have all rights and powers, and shall perform all the functions and duties, of the Debtor as debtor-in-possession</u>, until the date (the "**Payoff Date**") Lender's claims against Debtor, including all interest, fees, costs and other charges allowed or allowable under Section 506(b) of the Bankruptcy Code, are indefeasibly paid in full in cash. <u>All actions taken by the Controlling Person shall be deemed authorized under applicable nonbankruptcy law as if exercised and taken by unanimous action of the Debtor's board of directors and, until the Payoff Date, the rights and obligations of the Debtor's board shall be delegated to the Controlling Person.</u>

(emphasis added).

The Second Cash Collateral Order was entered by the Court after substantial negotiations between the parties regarding the use of cash collateral, adequate protection, and the Lender's motion to appoint a chapter 11 trustee.  After denial of the Debtors' Motion to Amend First Cash Collateral Order on January 18, 2005 (Doc. No. 357), the Court adjourned further proceedings on the use of cash collateral and appointment of a chapter 11 trustee to January 20, 2005, pending negotiations by the parties.  See Order dated January 19, 2005 (Doc. No. 357).  On January 19, 2005, at 9:27 p.m., the Debtors filed a notice of consent to the Lender's proposal on the use of cash collateral which notice expressly contained language regarding the appointment of Budd as Controlling Person (Doc. No. 365).  The Debtors' agreement to the Lender's proposal resolved many difficult issues involving the possible appointment of a chapter 11 trustee and the continued operation of the Debtors themselves.  See Supplemental Memorandum of RVSI Investors, L.L.C. in Support of Emergency Motion for Appointment of a Trustee filed at 0:40 a.m. on January 20, 2005 (Doc. No. 368).  After extensive negotiations over language and drafting, the parties presented a consensual cash collateral order to the Court on January 20, 2005.  Counsel for the Debtors, with Costa present in the courtroom, stated on the record that the Debtors agreed to the terms of the proposed order.  Based upon the agreement of the parties, the Court entered the Second Cash Collateral Order in the form agreed upon by the parties.

On January 31, 2005, ten days after the entry of the Second Cash Collateral Order, Costa filed his motion to amend that order (Doc. No. 453) (the "Motion to Amend").  The Motion to Amend was based upon an allegation by Costa, supported by other directors, that the Second Cash Collateral Order did not reflect the agreement authorized by the Board of Directors.  Costa alleged:

> The Second Cash Collateral Order was presented to the Court as having been consented to by the Debtors and their senior secured lender, RSVI (sic) Investors, L.L.C.  What was presented to the Court, however, does not reflect the agreement authorized by the Debtors' Board.  Specifically, while the Board consented to the appointment of J. Richard Budd as the "Controlling Person," it specifically conditioned Mr. Budd's appointment upon a five-point plan of action that is not reflected in the Second Cash Collateral Order.  The Board only became aware of these omissions on January 24, 2005, and it has since learned that Mr. Budd is no longer willing to honor his commitment to the Board that its plan of action will be pursued.  The Board would not have authorized the Debtors to consent to the Second Cash Collateral Order unless the agreement that it made with Mr. Budd was memorialized in the document or assurances were given that its agreement with Mr. Budd could be enforced through some other mechanism.

Motion to Amend at 1-2.  The hearing on the Motion to Amend was originally scheduled for March 3, 2005.  See Notice of Hearing dated February 1, 2005 filed by Costa (Doc. No. 459).  On February 1, 2005, Costa filed a motion to expedite the hearing (Doc. No. 463), which motion was granted by the Court the next day (Doc. No. 467).  The Motion to Amend was opposed by the Debtors (Doc. No. 568), whose opposition was supported by declarations of New York and New Hampshire counsel (Doc. Nos. 568 and 569), Budd (Doc. No. 468), the Committee (Doc. Nos. 469 and 530), Intel Corporation (Doc. No. 484), and the Lender (Doc. No. 490).  The hearing was held on February 15, 2005.

At the conclusion of the hearing the Court denied the Motion to Amend.  See Order dated February 15, 2005 (Doc. No. 581).  Contrary to Costa's contention, the denial of the Motion to Amend was not based on the Court's believing the declarations of various professionals and ignoring the "overwhelming evidence in support of Costa's allegations."  Costa's Motion to Amend was denied because Costa failed to establish grounds to alter or amend the Second Cash Collateral Order under the standards of Federal Rule of Civil Procedure 59, made applicable to the Motion to Amend by Federal Rule of Bankruptcy Procedure 9023.  During the hearing, the

Court noted the disagreements between Costa and his supporters, on the one hand, and the Debtors and their counsel, on the other hand.

At the hearing on the Motion to Amend the Court expressed the view that the conflicts between the various declarations filed by Costa and his opponents would require an evidentiary hearing in order for the Court to resolve the many factual disputes between the parties.  The transcript of the February 15, 2005, hearing (Doc. No. 739) (the "2/15/05 Transcript") contains the following colloquy between the Court and Costa's counsel:

| | |
|---|---|
| The Court: | Now, on this record I've got affidavits that are - - right?  I mean, you can't reconcile them correct? |
| Mr. Dale: | Judge, they are hopelessly irreconcilable. |
| The Court: | Right. |
| Mr. Dale: | Either he [Budd] was on the phone or he wasn't and I'm looking forward to resolving that. |
| The Court: | Either it was discussed or it wasn't. |
| Mr. Dale: | Right. |
| The Court: | But if we're going to do that, we're going to have to have some kind of hearing on that issue. |
| Mr. Dale: | Yes sir. |
| The Court: | Because, otherwise, I've got no basis for any findings. |

2/15/05 Transcript at page 66, line 16 through page 67, line 4.  At the end of the hearing the Court stated that the Motion to Amend was governed by Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, which required Costa to establish a manifest error of law or newly discovered evidence before the Court could alter or amend the Second Cash Collateral Order.  Landrau-

<u>Romero v. Banco Popular de Puerto Rico</u>, 212 F.3d 607, 612 (1st Cir. 2000). The Court then stated its ruling on the record:

> No one has even remotely come close to a manifest error of law . . . the Court approved what was represented to it as a consensual cash collateral order. The Court has the authority to do that. I have the authority to do it without consent, but I certainly have the authority to authorize the use of cash collateral on whatever terms meet the requirements of the Code, and if the parties agree, that, by definition, is going to meet those requirements.
>
> There is no newly discovered evidence here. So I don't - - I'm going to deny this motion because, number, I don't think it meets the standard of Rule 59. Even if it was Rule 60, you'd get the same result.

2/15/05 Transcript at page 97, lines 11 through 22. In addition the Court stated:

> [T]he only way as a court I can encourage the consensual resolution of any issue in a bankruptcy case from a chapter 13 to a major chapter 11 like this one is to enforce consensual agreements. If you're not going to enforce consensual agreements, the people aren't going to make them. And as far as I'm concerned in this case, whether it was a mistake by the debtor or the debtor's counsel, or the debtor's - - Mr. Budd, or whoever, regardless of what was filed on the evening of January 19th, 2005, this Court entered an order that was agreed to in substance on the record in this Court by the debtor, and nobody has given me a good reason not to enforce the terms of that order. That's another reason to deny this motion.

2/15/05 Transcript at page 98, lines 18 to 25 and page 99, lines 1 to 5. Accordingly, by any objective standard, the denial of Costa's Motion to Amend was not based upon any finding or ruling on the differences between the declarations filed in connection with the motion and the objections thereto. The denial was based upon Costa's failure to meet the predicate under Rule 59 for consideration of the Motion to Amend.

## 2. Motion to Appoint a Chapter 11 Trustee

Shortly after the denial of the Motion to Amend, the Court considered the sale of one of the Debtors' two operating divisions. The sale was approved by order dated March 11, 2005 (Doc. No. 819). Although it had been anticipated that the sale would generate sufficient

16

proceeds to pay the Lender in full and restore Costa and the Board of Directors to operational control of the Debtors, the proceeds were insufficient.  Accordingly, Budd continued as Controlling Person.

Following failure of the sale to generate sufficient funds to pay the Lender in full, Costa filed a motion seeking appointment of a chapter 11 trustee (Doc. No. 961) (the "Trustee Motion").  In his Trustee Motion, Costa alleged fraud and gross mismanagement on the part of Budd, the Controlling Person appointed pursuant to the Second Cash Collateral Order. However, at a hearing on May 26, 2005, Costa withdrew his gross mismanagement claims and limited his motion to fraud.  See Order dated June 3, 2005 (Doc. No. 1076).  The fraud claims were identical to the claims made by Costa in his Motion to Amend.  If Costa were successful in seeking the appointment of a chapter 11 trustee, he and the Board of Directors would not be restored to operational control of the Debtors, rather, that responsibility would have rested with the chapter 11 trustee.  Commodity Futures Trading Comm'n. v. Weintraub, 471 U.S. 343, 352-53 (1985).  However, Budd would be removed as Controlling Person.

The Trustee Motion was vigorously contested by Budd, the Debtor, the Committee, and the Lender.  Costa sought to conduct extensive discovery in connection with the Trustee Motion and the parties opposing him objected to the scope and depth of the discovery sought by Costa. Afer a hearing, the Court granted much of the discovery sought by Costa, but limited the length and topics to the narrow fraud issues in the Trustee Motion, namely fraud relating to agreements alleged to have been made between Budd, Costa, and the Board of Directors immediately before and during the Directors' meeting of January 19, 2005, which led to the Debtors' consent to the entry of the Second Cash Collateral Order.  The Court issued an order on June 3, 2005 (Doc. No.

17

1076) (the "Scheduling Order"), requiring discovery to be completed within fifty-seven days, by

July 27, 2005, with a one-day trial on the Trustee Motion scheduled for August 5, 2005.

At the hearing on May 26, 2005, the Court expressed concern that the extensive

discovery sought by Costa would result in the Trustee Motion becoming moot if the sale of the

Debtors' remaining operating division were consummated before the hearing on the Trustee

Motion.  Although Costa sought reconsideration of the Scheduling Order and a delay in the sale

of the Debtors' remaining assets, his request was denied for (a) failure to identify any new

information; (b) the need to protect the due process rights of all involved; (c) the need to

schedule the hearing on the Trustee Motion as soon as possible; and (d) the existence of

substantive provisions of the Bankruptcy Code providing Costa with the opportunity to appear

and be heard on any sale activity to which he objected.  See Order dated June 9, 2005 (Doc. No.

1100).

Subsequently a dispute developed between Costa and the Debtors over the risk of

disclosure of documents in the possession of Costa, which documents were subject to claims of

attorney client privilege or attorney work product.  After a hearing on June 28, 2005, the Court

entered an order denying a motion filed by the Debtors seeking an order directing Costa not to

disclose privileged information (Doc. No. 1152).  Subsequently, Costa filed a motion on July 7,

2005, seeking production of documents from the Debtors and their professionals which were

being withheld under claims of attorney client privilege and attorney work product (Doc. No.

1168) (the "Motion to Compel").

After a hearing on July 8, 2005, the Court granted the Motion to Compel, subject to

restrictions on use and disclosure, for all documents created prior to January 20, 2005, the day

18

following the Directors' meeting that was the subject of the Trustee Motion.  See Order dated

July 11, 2005 (Doc. No. 1180).  At the hearing on July 8, 2005, the Court once again expressed

its concern that Costa's continuing requests to expand the scope of discovery could lead to the

Trustee Motion being rendered moot by the occurrence of events in the case (i.e., the sale of the

Debtors' remaining operating division).  At the conclusion of that hearing, the Court addressing

Costa's counsel stated:

> . . . if people want to expand [discovery], that's fine.  We can expand it, but
> we're not going to have a hearing in August – or at least not August of this year.
> I mean, that's the problem.  This case is already on a fast track, and the longer we
> delay, the more rocks we kick over, the further away that hearing is going to get,
> and pretty soon it's all going to become moot anyway.
>
> So . . . I'm trying to balance the need for some due process rights for everyone,
> including [Costa], with the need to get it done in time before it becomes moot by
> the occurrence of other events beyond the control of the parties.

On July 25, 2005, Costa moved to permit two New York City attorneys to testify at the

trial of the Trustee Motion by video conference and, pursuant to claims of attorney client

privilege by the Debtors, to have such testimony received under seal pending a ruling on the

claims of privilege by the Court (Doc. No. 1202) (the "Video Motion").  At a hearing on July 27,

2005, it became apparent that all parties, including Costa, desired to complete additional

discovery on the Trustee Motion and that the trial was unlikely to proceed on August 5, 2005.

The Court entered an order suspending the deadlines in the Scheduling Order, continuing the

hearing on the Video Motion to August 2, 2005, and directing that certain documents and a

status report on discovery be filed by the parties (Doc. No. 1212).  After a hearing on August 2,

2005, the deadlines in the Scheduling Order were reinstated, but due to the number of witnesses

expected to be called, the trial on the Trustee Motion was rescheduled for three days on October

6, 7, and 11, 2005 (Doc. No. 1222).  The Court also entered an order granting additional time to

Costa to take the depositions of the New York City attorneys requested by him in the Video

Motion on or before September 14, 2005, and to disclose to the opposing parties on or before

August 9, 2005, the identity of any person or persons involved in certain telephone conversations

with Budd, and granting the Debtors until September 14, 2005, the right to depose any such

persons (Doc. No. 1225).

On August 26, 2005, the Debtors filed a motion requesting the Court to establish

procedures for approving a proposed sale of the Debtors' remaining operating division, including

auction procedures in the event that competing buyers existed (Doc. No. 1269).  At the hearing

on August 30, 2005, the Debtors opposed Costa's request that he be present at any such auction.

After argument, the Court overruled the Debtors' objections and permitted Costa to be

represented at any auction.  On September 2, 2005, the Court approved procedures for the

proposed sale (Doc. No. 1290).  However, no competing bids were ultimately received and the

auction was never held.  See Debtors' Notice dated September 20, 2005 (Doc. No. 1334).

On September 23, 2005, the Court held a hearing on the Debtors' motion to sell its

remaining operating division.  After an evidentiary hearing, the Court approved the sale and

directed the Debtors to circulate to all parties present and file with the Court a revised proposed

order approving the sale (Doc. No. 1359).  The final order approving the sale was entered on

September 27, 2005 (Doc. No. 1369).  On the same day, the Committee filed a motion, assented

to by the Debtors, to continue the trial on the Trustee Motion for thirty days (Doc. No. 1370) (the

"Motion to Continue").  The Motion to Continue alleged that, after the closing of the sale of the

Debtors' remaining operating division, the only assets remaining to be administered would be

20

the claims against officers and directors detailed in the examiner's report dated June 10, 2005 (Doc. No. 1103), and that Budd would not be winding up the Debtors' estates.  The Motion to Continue also alleged that because the only remaining assets of the estate were possible claims against Costa and the Board of Directors, Costa and the Board of Directors should be disqualified from presiding over the remaining affairs of the Debtors.  Costa objected and argued that the Trustee Motion was not moot because Budd was still in control of the Debtors and that after eight months, when "the parties have conducted extensive discovery and are basically ready for trial," a continuance would prejudice Costa (Doc. No. 1373).  On October 6, 2005, the Committee filed a motion to convert the Debtors' cases to chapter 7 (Doc. No. 1419) (the "Motion to Convert").  In the Motion to Convert, the Committee alleged that the sale of the Debtors' last operating division closed on October 3, 2005, and that cause existed to convert the case because the estates were administratively illiquid, no plan of reorganization was likely, and continued delay in the liquidation of the remaining assets of the Debtors would be prejudicial to creditors.  The UST joined in the Motion to Convert (Doc. No. 1435).  Costa filed a response indicating an interest in formulating a reorganization around the Debtors' remaining assets (Doc. No. 1427).  After a hearing on October 11, 2005, the Court granted the Motion to Convert (Doc. No. 1444) and denied as moot the Trustee Motion (Doc. No. 1441).  However, the order denying the Trustee Motion as moot specifically provided "[t]o the extent that any of the issues raised in [the Trustee Motion] become an issue in any future proceeding before this Court, parties can seek to have any of the discovery from this proceeding used in those future proceedings."

### 3.  Objections to Final Fee Applications

In connection with the final fee applications by Dreier[4] and MGBD,[5] Costa filed

objections alleging malpractice, fraud, and lack of benefit to the estate.  The fraud allegations

raised by Costa are identical to those raised in the Motion to Amend and the Trustee Motion.

For the reasons set forth in its memorandum opinion dated May 26, 2006, In re Robotic Vision

Sys., Inc., 343 B.R. 393 (Bankr. D.N.H. 2006), the Court held that under the First Circuit's

decision in Iannochino v. Rodolakis (In re Iannochino), 242 F.3d 36 (1st Cir. 2001), the

consideration of the final fee applications of Dreier and MGBD would be converted to adversary

proceedings.  Those adversary proceedings are currently on hold pending a decision on the

Motion.

### C.  Negative Characterization of Costa

In the Motion, Costa alleges that the Court has "on more than one occasion, . . . tacitly

adopted Budd and [Dreier's] characterization of Costa, once describing Costa sarcastically as a

'bomb' thrower."  Costa supports this allegation with only one example, a statement attributed to

the Court at a hearing held on August 30, 2005.  However, Costa has taken the statement out of

context and, by ignoring the statements by the Court immediately before and after the cited

statement, as well as the subject of the hearing and the ruling of the Court, he fails to understand,

or acknowledge, that the Court's comments were directed at Debtors' counsel, not him.

On August 30, 2005, the Court held a hearing on the Debtors' motion to establish sale

procedures for the sale of their last operating division (Doc. No. 1269).  The Debtors were

---

[4]  Dreier is seeking a final fee award of $3,009,678.55 (Doc. No. 1502).

[5]  MGBD is seeking a final fee award of $1,706,451.00 (Doc. No. 1503).

objecting to Costa receiving certain information on the sale and attending any auction that would

be held if a qualifying bid were submitted.  Despite the Debtors' attempts to deny Costa certain

information on the details of the proposed sale and the right to attend any auction, the Debtors

proposed that they have flexibility to alter the terms of the auction to accommodate the situation

encountered on the day of the auction and that any party objecting to the sale have a very short

time frame (i.e., 48 hours) to file an objection with the Court.  The unfairness of such a

procedure to a major creditor like Costa, who had shown a continuing interest in the case, was

obvious.  The transcript of the August 30, 2005, hearing (Doc. No. 1320) (the "8/30/05

Transcript") reflects the following exchanges between the Court and counsel for the Debtors:

> The Court:    What - - what are the problems with having Mr.
> Costa or someone representing him just observe the
> auction?
>
> Mr. Kinel:    The problem with that, Your Honor, is it probably
> cost the estate about $10,000 last time they attended
> the auction because we had objections that were
> raised to the auction process itself that required –
>
> The Court:    What, during the auction?
>
> Mr. Kinel:    – that required – it wasn't during the auction, Your
> Honor, but – but there were pleadings filed that
> were outright false.

8/30/05 Transcript at page 29, lines 11 to 21.

> The Court:    . . . Here's the question I have.  All right.  The
> procedures this time, as last time, contemplated the
> debtor having the discretion to sort of alter or
> change things as the auction goes on.
>
> Mr. Kinel:    After consultation with the lender and the
> Committee, yes.

| The Court: | Yeah, open bid, sealed bid, all that kind of stuff that happens, and you're currently contemplating this auction running on the 21st [of September]? |
| --- | --- |
| Mr. Kinel: | Correct. |
| The Court: | And having a hearing on the 23rd? |
| Mr. Kinel: | That's right. |
| The Court: | All right.  Now how does anybody, I mean, whether we like him or not – Mr. Costa has been consistently involved in this case.  That's fair.  You may say to the – to the estate's detriment that he's been involved.  He doesn't just show up on occasion to shoot, you know throw bombs and take potshots at people.  He comes regularly to do that, <u>in your view</u>, okay, but he's a regular – |
| Mr. Kinel: | I couldn't have said it better. |
| The Court: | It seems to me he's shown a serious interest.  You know, he keeps paying [his counsel] to show up.  You know, that's not a frivolous thing to do.  So how does somebody between the close of the auction on the 21st and the commencement of a hearing a few days later raise any objection to anything that was done?  If they're not there, they don't even know it was done unless someone's going to file a report of the procedures that were used or something else is going to happen.  I mean, you know, if we do it all in the back room, then who can object to what happened in the back room if they don't know? |

8/30/05 Transcript at page 29, line 24, through page 31, line 5 (emphasis added).  Later the Court

posed a rhetorical question to Debtors' counsel:

| The Court: | But the question remains how does someone who has a serious interest in this case, not a johnny-come-lately or something like that, how do they – how do they monitor whether the process as it actually operates at the auction was appropriate?  I |
| --- | --- |

> mean, I understand you don't want to deal with an
> objection from him, but it seems to me it's – it's
> legitimate for him to say, "look, I'd like to actually
> know what really happened."

8/30/05 Transcript at page 32, lines 8 through 15.

On September 2, 2005, the Court entered an order providing in part that any auction would occur in the courtroom on September 21, 2005, and that any creditor who filed or was scheduled by the Debtors with a claim in excess of $250,000 would be permitted to attend. See Order dated September 2, 2005, at ¶¶ 8 and 9 (Doc. No. 1290). Accordingly, Costa would have been able to attend the auction if it had been held. In fact, no qualifying bid was made and no auction was held. See Debtors' Notice dated September 20, 2005 (Doc. No. 1334).

The 8/30/05 Transcript reflects the Court's comments were directed to Debtors' counsel in an attempt to demonstrate to him that his position was in violation of Costa's legitimate rights, which were ultimately protected by the Court.

**D. Undue Deference to Estate Professionals**

Costa contends in the Motion that "[d]espite the overwhelming evidence in support of Costa's allegations, it would be difficult for the Court to conclude that estate professionals are guilty of misconduct because it has repeatedly been put in a position where, even in the face of opposition from Costa, who consistently complained of fraud and other misconduct, the Court relied on the representations of Budd and Kinel in rendering its decision." Motion at ¶ 5. As discussed in sections III.B and III.C above, the Court has consistently permitted Costa an opportunity to protect his rights and to present his "overwhelming evidence" in an evidentiary hearing. However, Costa has not as yet presented such "overwhelming evidence" because he has consistently sought to extend discovery deadlines set by the Court in order to conduct additional

25

discovery.  He did so despite repeated admonitions by the Court that the Debtors' chapter 11 proceedings would not, and could not, be placed on hold while he conducted extensive discovery and that the passage of time might moot the issues raised in his Trustee Motion.  Costa failed to recognize that unless and until he presented his "overwhelming evidence" in a contested evidentiary hearing and the Court found in his favor, the Debtors, as debtors in possession managed by Budd and represented by counsel, had the power to operate the Debtors' business in the ordinary course without Court approval.  Commodity Futures Trading Comm'n. v. Weintraub, 471 U.S. 343, 352 (1985).

Costa alleges that the Court's deference to the business judgment of the Debtors on matters that required Court approval now inhibits the Court's ability to fairly adjudicate Costa's claims or shows bias against Costa.  However, the Motion does not address the discretion accorded to a trustee or debtor in possession to administer the bankruptcy estate and the judicial deference to which the fiduciary's business judgment is entitled.  In re WPRV-TV, Inc., 143 B.R. 315, 319 (D.P.R. 1991) (noting judicial deference accorded trustee's business judgment on a proposed sale), vacated on other grounds, 165 B.R. 1 (D.P.R. 1992); In re Thinking Machs. Corp., 182 B.R. 365, 368 (D. Mass. 1995) (debtor's decision to reject an executory contract should be accorded the deference mandated by the business judgment rule as applied to the actions or decisions of corporate directors), rev'd on other grounds, 67 F.3d 1021 (1st Cir. 1995). Costa offers no logical explanation as to why a court that has relied on the business judgment of the management of the Debtors would be inhibited in determining whether management's position was obtained through a fraud on the court.  Logic would suggest that after presentation

of the "overwhelming evidence" uncovered by Costa, a court that had been deceived would be more, rather than less, likely to rule in his favor.

Costa offers, as evidence of the Court's deference to estate professionals, an order dated June 7, 2006 (Doc. No. 1715) denying one of Costa's objections to the use of a carve-out to pay final fees awards "based upon factual and legal arguments that were not even made by the affected professionals." Costa fails to specify exactly what aspect of that order demonstrates deference to professionals. An examination of the order in question reflects that it was based upon prior proceedings on the record of this case and Costa's consent to those proceedings. Deference to estate professionals had nothing to do with the decision.

### E. Grant of Extension of Time to Trustee

Costa alleges that the Court displayed deference to the Trustee when it recently granted an extension of time (Doc. No. 1722) for the Trustee to object to Costa's secured claim even though the duration of the extension, standing alone, might be deemed unreasonable. However, Costa forgets, or chooses to omit, the Court's statement at the conclusion of the hearing on the reason for the extension. The Court stated that if the extension were likely to result in a delay in payment to Costa on account of his secured claim, the Court would not be inclined to approve the request. However, in this case, the source of funds from which Costa's claim can be paid is limited to future proceeds from the proposed Intel settlement and/or the Trustee's claim against the former officers and directors of the Debtors, including Costa. Therefore, the Court found that an extension of the deadline would not delay any ultimate payment to Costa on his secured claim. In the absence of any harm or delay to Costa, the Court granted the requested extension

and indicated that further extensions were unlikely.  Such a decision is hardly the stuff of excess deference to estate professionals.

## IV.  CONCLUSION

For the reasons set forth in this opinion, the Court finds no objective basis to find that an objective, knowledgeable member of the public would find a reasonable basis questioning the fairness or impartiality of the Court in matters involving the compensation, conduct, or actions of estate professionals.  Accordingly, the Motion shall be denied.

This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate order consistent with this opinion.

ENTERED at Manchester, New Hampshire.


Date:   September 13, 2006                    /s/ J. Michael Deasy
                                              J. Michael Deasy
                                              Bankruptcy Judge